UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| DPWN HOLDINGS (USA), INC.<br><br>Plaintiff,<br><br>v.<br><br>CHINA AIRLINES LTD,<br><br>Defendant. | Civil Action No. 1:14-cv-07296<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff DPWN Holdings (USA), Inc., on behalf of itself and as the assignee of all relevant claims of its affiliated entities (collectively "DHL"), brings this action for damages and injunctive relief to remedy violations of the federal antitrust laws by Defendant China Airlines Ltd. ("China Airlines"). DHL alleges as follows:

**INTRODUCTION**

1. China Airlines and its competitor airlines ("Airfreight Carriers") engaged in and actively concealed a secret and unlawful conspiracy (the "Cartel) from at least January 1, 2000, through at least September 2006 (the "Cartel Period"), to fix, raise, maintain and/or stabilize the prices for air cargo shipments ("Airfreight Shipping Services"), including the prices for air cargo shipments to and from the United States ("U.S. Airfreight Shipping Services").

2. On or about September 27, 2010, China Airlines signed a plea agreement with the U.S. Department of Justice admitting to criminal violations of the Sherman Act and agreeing to pay a criminal fine of $40 million for its participation in the Cartel. In its plea agreement, China

Airlines admitted to fixing "cargo rates" on "routes to/from the United States" from "at least as early as January 2001, until at least February 14, 2006." China Airlines also made a "factual admission of guilt" that the carrier "through its officers and employees, including high-level personnel . . . participated in a conspiracy with other providers of air cargo services, a primary purpose of which was to suppress and eliminate competition by fixing one or more components of the cargo rates charged to customers," and "in furtherance of the conspiracy . . . engaged in discussions and attended meetings with representatives of other providers of air cargo services," where "agreements were reached to fix one or more components of the cargo rates to be charged to purchasers of certain air cargo services."

3. To date, nineteen Airfreight Carriers, in addition to China Airlines, have pled guilty to felony antitrust violations in the United States for their involvement in the Cartel and have paid criminal fines totaling almost $1.75 billion. In addition, thirteen Airfreight Carrier executives have been charged in the U.S. Department of Justice's investigation and six have pled guilty, paid criminal fines and been sentenced to serve varying prison terms.

4. On May 6, 2014, China Airlines entered into a settlement agreement with a proposed settlement class of direct purchasers, under which China Airlines agreed to pay $90 million to settle claims from January 1, 2000, through September 11, 2006. As a direct purchaser of U.S. Airfreight Shipping Services, DHL was a putative member of the settlement class. However, DHL timely opted out of the China Airlines class settlement.

5. During the Cartel Period, China Airlines and its co-conspirator Airfreight Carriers agreed to, implemented, and received payments from DHL for (1) illegally fixed base-freight rates and (2) illegally fixed Fuel Surcharges and Security Surcharges that were imposed on top of the base-freight rates. At the time China Airlines and its co-conspirators imposed these

Surcharges, the base-freight rates were at artificially high levels as a result of collusion among the Airfreight Carriers, and the Cartel members agreed not to cut base rates to offset Surcharges. At all relevant times, the Fuel Surcharges and Security Surcharges over-recovered for increases in the actual costs of fuel and security incurred by China Airlines and the other Cartel members.

6. During the Cartel Period, DHL purchased at least $3 billion in total U.S. Airfreight Shipping Services from Cartel members. DHL's purchases from China Airlines alone amounted to approximately $200 million, including approximately $25 million in Fuel and Security Surcharges.

7. As a participant in the Cartel and a supplier of U.S. Airfreight Shipping Services to DHL during the Cartel Period, China Airlines is jointly and severally liable for three times the Cartel's overcharges to DHL, which amounts to hundreds of millions of dollars.

## JURISDICTION AND VENUE

8. This action is brought pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to obtain injunctive relief and to recover damages and costs of suit, including reasonable attorneys' fees and costs, for the injuries sustained by DHL as a result of China Airlines' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, as alleged herein.

9. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

10. China Airlines' Sherman Act violations occurred in and directly and substantially affected United States commerce, including United States import commerce. These violations give rise to DHL's claims in this action under Section 1 of the Sherman Act.

11. Venue is proper in this District under Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. § 1391(b), (c) and (d). At all relevant times, China

Airlines resided, transacted business, maintained offices, maintained agents or was found in this District, and events giving rise to DHL's claims, as well as a substantial portion of the affected interstate trade and commerce as described below, occurred and were carried out, in this District. China Airlines also inserted products or services in the stream of commerce that were intended to and did reach this District.

## PARTIES

12. Plaintiff DPWN Holdings (USA), Inc. ("DPWN") is a corporation organized under the laws of Ohio, with its principal place of business located at 1200 South Pine Island Road, Suite 600, Plantation, Florida 33324. DPWN is the holding company of all DHL operating companies in the United States, including but not limited to DHL Express (USA), Inc., Exel, Inc. and Danzas—which, together with DPWN, are collectively referred to herein as "DHL." DPWN is the assignee of the legal right to prosecute and recover damages in this action of its commonly-owned companies that purchased U.S. Airfreight Shipping Services from China Airlines during the Cartel Period. DHL is engaged in the business of providing, among other things, logistics and freight-forwarding services to manufacturers and other businesses that require the transportation of goods to and from the United States. DHL is one of the largest (if not the largest) global purchasers of U.S. Airfreight Shipping Services. At all relevant times, DHL directly purchased U.S. Airfreight Shipping Services from, and paid base-freight rates and Surcharges to, China Airlines.

13. China Airlines is a foreign company organized under the laws of Taiwan with its headquarters located at No. 131, Sec. 3, Nanjing E. Road, Taipei City 104, Taiwan. China Airlines conducts Airfreight Shipping Services throughout the world, including in the United

States and this District, and maintains an office at 633 Third Avenue, 8th Floor, Suite 800, New York, New York 10017.

**INTERSTATE COMMERCE**

14. At all times relevant to this action, China Airlines engaged in a continuous and uninterrupted flow of transactions in U.S. Airfreight Shipping Services that occurred in and involved interstate commerce, including United States import commerce. Moreover, China Airlines participated in a Cartel that directly harmed U.S. commerce and purchasers of U.S. Airfreight Shipping Services, such as DHL. The Cartel and China Airlines' conduct in furtherance of the Cartel had a direct, substantial and reasonably foreseeable effect upon United States interstate commerce, including United States import commerce.

**FACTS**

**I.     The Cartel Fixed Fuel Surcharges**

15. Prior to the Cartel Period, competition was putting downward pressure on the price of Airfreight Shipping Services, and Airfreight Carriers were concerned about engaging in price wars that would undermine profits.

16. The Airfreight Carriers initially designed an industry fuel-surcharge mechanism through meetings and agreements reached at the International Air Transport Association ("IATA"). IATA Resolution 116ss, which was adopted by the Airfreight Carriers in 1997, provided for a Fuel Surcharge tied to percentage changes in the spot price of aviation fuel as tracked by IATA's fuel price index (FPI). That FPI was based on the June 1996 average spot price of aviation fuel in five markets around the world (i.e., IATA set its FPI at 100 to represent the average spot price of aviation fuel in June 1996). The IATA FPI's initial Fuel Surcharge was USD 0.10 (or the equivalent amount in local currency) per kilogram, regardless of the distance

shipped. The Airfreight Carriers agreed that IATA members would implement this Fuel Surcharge by March 1, 1997, provided the FPI remained above 110 (i.e., spot prices remained ten percent above the June 1996 average spot price). Thereafter, the Fuel Surcharge would remain in effect until the FPI fell below 110. If the FPI reached 150, the Airfreight Carriers agreed they would convene an IATA meeting to discuss further increases to the Fuel Surcharge.

17. The Fuel Surcharge set forth in Resolution 116ss was arbitrarily based on an index for the spot price of fuel, and did not take into consideration the effects of fuel hedging and of long-term contracts on the actual fuel costs incurred by the Airfreight Carriers. Indeed, the Fuel Surcharge did not even account for distance shipped, which is a major driver of the actual fuel costs incurred by Airfreight Carriers. But the FPI did provide a convenient coordinating mechanism for price fixing.

18. The Cartel Members including China Airlines knew that implementation of Resolution 116ss would violate the U.S. antitrust laws in the absence of a grant of antitrust immunity by the U.S. Department of Transportation ("DOT"). The director of the IATA Legal Department, Andrew Charlton, had warned IATA that

> [a]ntitrust laws prohibit competitors reaching any form of agreement, understanding or arrangement which is likely to have an impact on price. As a general rule, competitors cannot discuss in any way the price they intend charging consumers. There are very few exceptions to this. The relevant exception is where immunity has been granted by the relevant authority for rates reached pursuant to a particular procedure and within the strict confines of the terms of the approval itself. IATA has such an approval for this conference. These immunities are very rare.
>
> Without an immunity, authorities regard with great suspicion any situation where competitors charge the same rate. In the event that there is any evidence whatsoever that competitors have had an opportunity to communicate in any way, and charge the same rate, there is a very strong assumption that they do so having colluded.

> Until the particular approval is granted for any rate agreed at this conference, that situation would apply. In other words, *in my opinion, any airline which moves to charge the rate which is agreed at this conference before government approval, and therefore antitrust immunity, is obtained, would face a very strong evidential presumption that the rate being charged had been agreed between competitors and without antitrust immunity*. The question is one of evidence.

19. In late December 1999, the FPI crossed the 130 threshold set forth in Resolution 116ss.

20. On January 14, 2000, the Airfreight Carriers received a telex from the IATA Director of Tariff Services that read as follows:

> [Resolution 116ss] was not filed with the US DOT. This resolution [was not] submitted to the DOT in 1997 as IATA was not in a position, [at] that time, to provide the necessary economic justification that [th]ey required. . . . Accordingly, *Resolution 116ss [ha]s not been approved by the DOT or immunized from the operation of [U.S.] antitrust law*. This is required of all tariff conference [re]solutions before IATA may declare a resolution effective and before [a] tariff conference participant may implement the resolution. These [ar]e standard conditions that the US DOT has attached to the antitrust [im]unity it has provided to IATA[']s tariff conferences for many years.

21. On January 28, 2000, IATA submitted its application for approval of Resolution 116ss to the DOT.

22. In February 2000, the Cartel Members, including China Airlines, after communications among themselves, implemented Resolution 116ss and began charging supracompetitive Fuel Surcharges without antitrust immunity from the DOT.

23. On March 14, 2000, the DOT rejected antitrust immunity for Resolution 116ss, finding that the Fuel Surcharge mechanism was "fundamentally flawed and unfair to shippers and other users of cargo air transportation." The DOT concluded that Resolution 116ss would

result in "unjustified and unwarranted rate increases" and would "be adverse to the public interest and in violation of [section 41309 of Title 49 of the United States] Code."

24.  Following the DOT's denial of immunity for Resolution 116ss, IATA ceased publishing its FPI.  At that point, the Cartel members, including China Airlines secretly discussed and agreed to coordinate their pricing based on an FPI that Lufthansa published regularly on its website (the "Lufthansa FPI").  The Cartel members, including China Airlines secretly switched to the Lufthansa FPI to conceal the fact that they were, in effect, following the general methodology set forth in Resolution 116ss – despite DOT's denial of antitrust immunity.

25.  In late 2001 and early 2002, the Lufthansa FPI fell to a level requiring that the Fuel Surcharge be suspended.  In response, the Airfreight Carriers discussed and then agreed to re-recalibrate the Lufthansa FPI mechanism so that a Fuel Surcharge would resume at lower FPI levels than had been contemplated under Resolution 116ss, as modified.  In particular, they agreed to the following revised price-fixing schedule:

- FPI **increases** above **115** for 2 consecutive weeks: Fuel Surcharge set at $0.05/kg
- FPI **increases** above **135** for 2 consecutive weeks:  Fuel Surcharge adjusted to $0.10/kg
- FPI **increases** above **165** for 2 consecutive weeks:  Fuel Surcharge adjusted to $0.15/kg
- FPI **increases** above **190** for 2 consecutive weeks:  Fuel Surcharge adjusted to $0.20/kg
- FPI **falls** below **170** for 2 consecutive weeks:  Fuel Surcharge reduced to $0.15/kg
- FPI **falls** below **145** for 2 consecutive weeks:  Fuel Surcharge reduced to $0.10/kg
- FPI **falls** below **120** for 2 consecutive weeks:  Fuel Surcharge reduced to $0.05/kg
- FPI **falls** below **100** for 2 consecutive weeks:  Fuel Surcharge suspended

26.  Throughout the Cartel Period, China Airlines communicated regularly with other Cartel Members about the Fuel Surcharges and exchanged mutual assurances that they would adhere to the revised Fuel Surcharge methodology and charged Fuel Surcharges on slightly staggered dates in order to conceal the Cartel.

27.  Over the course of the Cartel, the Fuel Surcharge increased more than 600%, going from $0.10/kg to $0.60/kg, imposing substantial overcharges on DHL.

## II.     The Cartel Encompassed Security Surcharges

28.     Following the terrorist attacks of September 11, 2001, the Airfreight Carriers, including China Air, jointly agreed to impose an additional surcharge for the purported purpose of recouping increased security-related costs.

29.     The Security Surcharge was set at a flat rate based on weight and was not calibrated to match the actual increased security costs incurred by the Cartel members. A flat rate made the Security Surcharge easy to implement and monitor. As one Airfreight Carrier executive noted:

> The calculation on the basis of AW [actual weight] has already been applied in the calculation of the fuel surcharge and is therefore easier to communicate internally and externally. This has been particularly important in the current situation since a fast and successful implementation was important. In addition, the billing procedure is already known from the fuel surcharge and implemented.

30.     After discussions with other Cartel members, China Airlines and other Cartel Members implemented the Security Surcharge in October 2001, and DHL began paying Security Surcharges that significantly over-recovered for actual increased security costs.

## III.    The Cartel Included an Agreement Not to Discount the Surcharges.

31.     The Airfreight Carriers agreed that there should be "no exceptions" to the imposition of the Fuel Surcharge because "[a]llowing one exception [would] defeat the whole industrial movement." In order to enforce that agreement, the Airfreight Carriers established "[c]lose hotlines . . . with immediate effect among today's participants in case of doubt and contradicting/misleading market information."

32.     A Lufthansa executive noted that "[o]ne of the key success factors in recent years was to hold firmly the policy to apply the respective surcharge level without any negotiation or discount. We should be clear on this and not open up possible fields of discussion with our

customers. . . . Surcharges should also not be used as a competitive edge over another company."

33. China Airlines and other Airfreight Carriers agreed that there would be no unilateral negotiations or deals with customers to discount either the Fuel Surcharge or the Security Surcharge.

### IV. The Cartel Members Fixed Base Rates At Higher Levels Than They Otherwise Would Have Been

34. During the Cartel period, a number of the carriers, including China Airlines, fixed base rates on certain routes, including routes to/from the United States, at higher levels than they otherwise would have been. In addition, they agreed not to cut base rates to offset Surcharges – i.e., "no adjustments in net/net/rates, either whole or partial."

35. On a number of occasions during the Cartel Period, China Airlines discussed base rates and exchanged information regarding their base rates.

36. As a result of China Airlines' unlawful conduct, DHL paid higher base rates than it otherwise would have.

### V. The Airfreight Carriers Engaged in Frequent Communications to Monitor Adherence to the Cartel

37. In addition to agreeing and coordinating on Surcharges and base-freight rates, the Cartel Members, including China Airlines, engaged in frequent communications to make sure the Cartel was functioning properly both with respect to Surcharges and base rates. The communications included in-person meetings, e-mails, faxes, telephone calls and other communications during the Cartel Period in which they discussed competitively sensitive information, including prices, capacity and Surcharges.

38. As with the Fuel Surcharges, the Airfreight Carriers monitored compliance with their agreement to charge coordinated Security Surcharges.

## VI. Lufthansa's Leniency Application

39. In or around December 2005, Lufthansa entered the corporate leniency program with the United States Department of Justice ("DOJ"). According to the DOJ, "Lufthansa was conditionally accepted [into the leniency program] after it disclosed its role in the international cargo conspiracy . . . ." Lufthansa also obtained conditional leniency from the European Commission and competition authorities in other countries. Lufthansa, in communication with the DOJ, continued to participate in the conspiracy at least through February 2006, allowing the DOJ to collect more information about the Cartel.

## VII. The Dawn Raids and Subsequent Price Increases

40. On February 14, 2006, competition authorities around the world raided the headquarters of various European and United States Airfreight Carriers. The offices of China Airlines were not raided, and China Airlines continued to adhere to the Cartel agreement.

41. Notwithstanding the dawn raids, Lufthansa Cargo continued to publish the FPI with the apparent acquiescence of the DOJ as the DOJ continued its investigation.

42. In accordance with the Cartel agreement, the Airfreight Carriers, including China Airlines, increased its Fuel Surcharge after the dawn raids in accordance with the Cartel agreement. The Airfreight Carriers were careful to stagger the implementation dates of their Fuel Surcharge increases in an effort to conceal their involvement in the Cartel.

## VIII. China Airlines' Guilty Plea and Admission of Liability

43. China Airlines entered a Plea Agreement in the United States District Court for the District of Columbia on November 3, 2010. In its Plea Agreement, China Airlines agreed to a "factual admission of guilt to the Court" as follows:

> During the relevant period [at least as early as January 2001 until at least February 14, 2006], the defendant, through its officers and employees, including high-level personnel of the defendant, participated in a conspiracy with other providers of air cargo services, a primary purpose of which was to suppress and eliminate competition by fixing one or more components of the cargo rates [defined as base-freight rates and surcharges] charged to customers for certain air cargo services. In furtherance of the conspiracy, the defendant, through its officers and employees, engaged in discussions and attended meetings with representatives of other providers of air cargo services. During these discussions and meetings, agreements were reached to fix one or more components of the cargo rates to be charged to purchasers of certain air cargo services.

44. As a part of its Plea Agreement, China Airlines agreed to pay a criminal fine of $40 million for illegally fixing prices for U.S. Airfreight Shipping Services.

45. China Airlines' admission of guilt in its Plea Agreement constitutes prima facie evidence of liability in this case.

## IX. Other Cartel Members' Guilty Pleas and Criminal Fines

46. The following chart summarizes the guilty pleas entered and the fines paid by the Airfreight Carriers and their executives:

| Carrier | Date | Details |
|---|---|---|
| **Aerolinhas Brasileiras S.A.** | 2/19/2009 | Carrier pled guilty and paid a joint fine (with LAN Cargo) of $109 million |

| Carrier | Date | Details |
|---|---|---|
| **Air France-KLM** | 7/22/2008 | Carrier pled guilty and paid a fine of $350 million |
| | 4/26/2011 | An indictment was returned against Marc Boudier, former Executive Vice President of Air France's Cargo Division, and Jean Charles Foucault, former Vice President of Sales & Marketing in Air France's Cargo Division – the charges are still pending |
| **All Nippon Airways Co. Ltd.** | 12/6/2010 | Carrier pled guilty and paid a fine of $73 million (for price fixing in both the air cargo and air passenger industries) |
| **Asiana Airlines Inc.** | 5/5/2009 | Carrier pled guilty and paid a $50 million fine (for price fixing in both the air cargo and air passenger industries) |
| **British Airways Plc.** | 8/23/2007 | Carrier pled guilty and paid a $300 million fine – $100 million for passenger and $200 million for cargo |
| | 11/10/2008 | Keith Packer, a British citizen and former Commercial General Manager for British Airways World Cargo, pled guilty and agreed to an eight-month prison sentence and a $20,000 fine |
| **Cargolux Airlines International S.A.** | 5/12/2009 | Carrier pled guilty and paid a $119 million fine |
| | 12/8/2011 | Ulrich Ogiermann, former President and CEO of Cargolux, and Robert Van de Weg, former Senior Vice President of Sales and Marketing for Cargolux, each pled guilty and agreed to serve 13 months in prison |
| **Cathay Pacific Airways Ltd.** | 7/22/2008 | Carrier pled guilty and paid a $60 million fine |
| **China Airlines Ltd.** | 11/3/2010 | Carrier pled guilty and paid a $40 million fine |
| **El Al Israel Airlines Ltd.** | 2/4/2009 | Carrier pled guilty and paid a $15.7 million fine |
| **EVA Airways Corporation** | 6/24/2011 | Carrier pled guilty and paid a $13.2 million fine |
| **Japan Airlines International Co. Ltd.** | 5/7/2008 | Carrier pled guilty and paid a $110 million fine |
| | 11/16/2010 | Takao Fukuchi, former president of JAL Cargo Sales, was indicted – the charges are still pending |
| **Korean Air Lines Co. Ltd.** | 8/24/2007 | Carrier pled guilty and paid a $300 million fine (for price fixing in both the cargo and passenger industries) |
| **LAN Cargo S.A.** | 2/19/2009 | Carrier pled guilty and paid a joint fine (with Aerolinhas Brasileiras) of $109 million |

| Carrier | Date | Details |
|---|---|---|
| **Martinair Holland N.V.** | 7/22/2008 | Carrier pled guilty and paid a $42 million fine |
| | 6/26/2009 | Franciscus Johannes de Jong, former Vice President of Cargo Sales in Europe for Martinair, pled guilty and agreed to a $20,000 fine and an eight-month prison sentence |
| | 9/21/2010 | An indictment was returned for Maria Christina "Meta" Ullings, the former Senior Vice President of Cargo Sales and Marketing for Martinair Cargo – the charges are still pending |
| **Nippon Cargo Airlines Co. Ltd.** | 5/8/2009 | Carrier pled guilty and paid a $45 million fine |
| | 11/16/2010 | Indictments were returned against Yoshio Kunugi and Naoshige Makino, both former senior executives at Nippon Cargo – the charges are still pending<br><br>Mr. Kunugi also worked at All Nippon Airways after leaving Nippon Cargo in August 2005 |
| **Northwest Airlines LLC** | 8/27/2010 | Carrier pled guilty and paid a $38 million fine |
| **Polar Air Cargo LLC** | 10/15/2010 | Carrier pled guilty and paid a $17.4 million fine |
| **Qantas Airways Ltd.** | 1/14/2008 | Carrier pled guilty and paid a $61 million fine |
| | 5/15/2008 | Bruch McCaffrey, former Vice President of Freight for the Americans at Qantas, pled guilty and agreed to serve eight months in jail and to pay a $20,000 fine. |
| **SAS Cargo Group A/S** | 7/21/2008 | Carrier pled guilty and paid a $52 million fine |
| | 8/29/2008 | Timothy Pfeil, SAS's former highest-ranking U.S. cargo executive, pled guilty and agreed to a $20,000 fine and a six-month prison sentence |
| | 8/12/2009 | Jan Lillieborg, SAS's former vice president of global sales, was indicted – the charges are still pending |
| **Singapore Airlines** | 2/8/2011 | Carrier pled guilty and paid a $48 million fine |

47.     The size of these fines reflects considerable customer overcharges, for which China Airlines is jointly and severally liable as regards to damages incurred by DHL.

**FRAUDULENT CONCEALMENT**

48.     China Airlines and its co-conspirators engaged in a successful price-fixing Cartel that by its nature was inherently self-concealing.  In addition, China Airlines and its fellow

Cartel members agreed among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal conspiracy.

49. China Airlines and its co-conspirators affirmatively and fraudulently concealed their unlawful conduct from DHL, including by, among other things, engaging in secret communications, giving false and pre-textual reasons for the various Surcharges, staggering their implementation of changes in the Fuel and Security Surcharges, and instructing recipients of e-mails concerning the Cartel to keep them "strictly CONFIDENTIAL especially for anti-trust reasons" and to delete them. The Cartel members also explicitly agreed to maintain the "confidentiality" of meetings. For example, one e-mail written by a Cartel member stated, "IT GOES WITHOUT SAYING THAT CARRIERS MEETINGS HAVE TO BE TREATED IN A VERY CONFIDENTIAL WAY."

50. Each of the Cartel members' Surcharge announcements during the Cartel Period were intentionally written to convey the impression that each carrier's Surcharges were imposed unilaterally and were necessary to cover increased costs.

51. Neither the U.S. Department of Justice nor any other freight forwarders, including DHL, were able to detect the Cartel because the Fuel Surcharges moved at approximately the same time as public fuel price indexes. Indeed, China Airlines' Surcharges and the Surcharges of other Airfreight Carriers were intentionally designed to give the appearance of unilateral and/or follow-the-leader responses to the common stimulus of higher fuel prices.

52. The dawn raids of February 2006 were the earliest point in time at which DHL could have reasonably learned of the Cartel, and DHL could not have discovered China Airlines' specific participation in the cartel until after DHL reached a settlement on July 5, 2010, with one of the Airfreight Carriers that had participated in the Cartel and obtained that Carrier's

cooperation in the form of production of secret, bilateral and multi-lateral communications evidencing China Airlines' participation in the Cartel.

## COUNT ONE

### VIOLATION OF SECTION 1 OF THE SHERMAN ACT

53. DHL restates and incorporates by reference each and every allegation contained in the preceding paragraphs.

54. During the Cartel Period, China Airlines participated in a global Cartel that fixed the base-freight rates and Surcharges for U.S. Airfreight Shipping Services that DHL paid.

55. China Airlines participated with other Airfreight Carriers in a Cartel that suppressed and eliminated competition by fixing the cargo rates, including Surcharges, charged to and paid by customers, including DHL, for international air cargo shipments, including to and from the United States from at least as early as January 1, 2000, through at least September, 2006.

56. China Airlines, through its officers and employees, including high-level personnel of China Airlines' cargo divisions, participated in a Cartel with other providers of U.S. Airfreight Shipping Services, a primary purpose of which was to suppress and eliminate competition by fixing prices, including Surcharges, charged to and paid by customers, including DHL, for U.S. Airfreight Shipping Services.

57. In furtherance of the conspiracy, China Airlines, through its officers and employees, engaged in discussions and attended meetings with representatives of one or more providers of U.S. Airfreight Shipping Services. During these discussions and meetings, China Airlines and other Cartel members reached agreements to fix prices, including Surcharges, which were charged to and paid by DHL.

58. China Airlines participated in numerous overt acts in furtherance of the Cartel, including engaging in communications and reaching agreements as to the prices, including Surcharges, to be charged for U.S. Airfreight Shipping Services. In these communications, China Airlines agreed with other Cartel members that it would impose uniform, non-discounted Surcharges.

59. At no time during the Cartel Period did China Airlines withdraw from the Cartel.

60. China Airlines' anticompetitive conduct, as described above, constitutes a per se unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

61. China Airlines' unlawful conduct had a direct and substantial adverse effect on U.S. commerce, including U.S. import commerce, which directly harmed DHL.

62. As a direct and proximate result of China Airlines' unlawful conduct and the unlawful Cartel alleged herein, DHL has suffered injury and damage to its business and property. DHL's injuries flow directly from the anticompetitive U.S. effects of the unlawful Cartel price-fixing agreements between China Airlines and its co-conspirators on U.S. commerce.

### DHL's DAMAGES

63. DHL restates and incorporates by reference each and every allegation contained in the preceding paragraphs.

64. China Airlines is jointly and severally liable for three times the damages that DHL suffered as a result of China Airlines' conduct in addition to the conduct of all other Airfreight Carriers that participated in the Cartel.

65. During the Cartel Period, DHL purchased at least $3.5 billion in U.S. Airfreight Shipping Services from the Airfreight Carriers that have pled guilty in the United States.

66. Those Airfreight Carriers overcharged DHL by hundreds of millions of dollars on DHL's purchases of U.S. Airfreight Shipping Services.

67. China Airlines is jointly and severally liable for three times the entire Cartel's overcharges paid by DHL, plus DHL's attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the Court to:

a. Declare that the Cartel alleged herein and in which China Airlines participated is an unreasonable and unlawful restraint of trade in violation of Section 1 of the Sherman Act;

b. Enter judgment against China Airlines, and in favor of DHL, for three times the overcharges it paid to the Cartel;

c. Order that each of China Airlines' successors, assigns, parents, subsidiaries, affiliates and transferees, and its officers, directors, agents and employees, and other persons acting or claiming to act on behalf of China Airlines or in concert with it, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing any contracts, combinations, conspiracies, agreements, understanding or concert of action, or adopting any practice, plan, program or design having a similar purpose or effect of restraining competition;

d. Award DHL its attorneys' fees and reasonable costs, and pre-judgment and post-judgment interest, to the fullest extent permitted by law; and

e. Award such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims asserted in this Complaint so triable.

-19-

| | |
|---|---|
| Dated:  December 15, 2014 | Respectfully submitted,<br>**ORRICK, HERRINGTON<br> & SUTCLIFFE LLP**<br><br>  /s/ J. Peter Coll, Jr.<br>J. Peter Coll, Jr.<br>pcoll@orrick.com<br>51 W. 52nd St.<br>New York, New York 10019<br>Tel:  (212) 506-5000<br>Fax:  (212) 506-5151<br><br>*Attorneys for Plaintiff DHL* |
| OF COUNSEL<br><br>Garret G. Rasmussen<br>grasmussen@orrick.com<br>Antony P. Kim<br>akim@orrick.com<br>Orrick, Herrington & Sutcliffe LLP<br>1152 15th Street, N.W.<br>Washington, D.C. 20005<br>Tel:  (202) 339-8400<br>Fax:  (202) 339-8500 | |